IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | No.  05-10228- 01, -02 -WEB |
| ) | |
| ARCHY BELTRAN-LUGO, and  ) | |
| EDER ZAMUDIO-CARRILLO,  ) | |
| ) | |
| Defendants.  ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | |


### Memorandum and Order

This matter initially came before the court on January 26, 2006, for an evidentiary hearing on the defendants' motions to suppress evidence.  The court took the motions under advisement at the conclusion of the hearing.  Shortly thereafter, defendant Beltran filed a motion to re-open the record and sought additional discovery.  The court orally granted these requests, and on February 14, 2006, another evidentiary hearing was conducted, at the conclusion of which the court again took the motions under advisement.  Having now reviewed the evidence and the record, the court is prepared to rule.[1]  For the reasons that follow, the court finds the motions to suppress should be denied.

I. *Facts.*

The court finds the following facts from the evidence presented at the hearings.  Trooper John D. Rule has been a Kansas Highway Patrol Trooper since 1991.  He is currently stationed out of the KHP

---

[1] Counsel for Mr. Zamudio indicated at the February 14th hearing that might file a supplemental brief shortly after the hearing, but the court has now been informed by counsel that he does not intend to file such a brief.

Troop D Headquarters at Hays, Kansas.  He frequently patrols Interstate 70 in northwest Kansas, and his duties include drug interdiction.  He is a trained K-9 drug-dog handler and instructor.   On November 21, 2005, at around noon or shortly thereafter, Rule was patrolling on I-70 west of Hays in Ellis County.  He was headed west when he noticed a white Ford Explorer with what he thought was an Arizona license plate traveling east.  Rule noticed that the rear of the Explorer appeared to be somewhat higher than normal. Rule has had extensive training and experience relating to the use by drug smugglers of hidden or false compartments in vehicles, including training on the manner in which false compartments are placed in vehicles.  He now spends part of his time training other officers on how to detect such compartments.  Rule has seized a number of Ford Explorers in the past -- according to his estimate somewhere between six and ten -- that contained hidden compartments with drugs or drug proceeds.  From his experience, Rule was aware that drug smugglers will often raise the rear end of a Ford Explorer to add a hidden compartment under the floor of the rear cargo area.  As he passed by the Explorer going the other way, Rule tried to look across the median at the car's rear wheel well.  It appeared to him in the brief second or two he was able to look that the area had a heavy, dark layer of undercoating, and there was something unusual about the configuration of the undercarriage of the vehicle.

Rule turned his car around on the median to follow after the Explorer and accelerated to catch up. As he did so, he passed by another vehicle, a green Ford Escape.  He noticed that the Escape had an Arizona specialty license plate.  The Escape was traveling about a quarter mile or less behind the Explorer. When Rule got closer to the Explorer, he saw it had the same kind of Arizona specialty plate as the Ford Escape.  Both of the tags had  images of small hand-prints at the bottom with the slogan, "It shouldn't hurt to be a child." Rule caught up with the Explorer and pulled to the side of it where he could get a better look

2

at the rear wheel well.  From his vantage point in the left lane, Rule saw what appeared to be a fresh area of heavy undercoating, which in his experience was unusual for a vehicle that was at least several years old, as this one appeared to be.  (The vehicle was in fact a 2001 model.)  He also thought he saw a metal wall or flange inside the wheel well which he did believe to be a factory-installed item.  Rule knew from experience that this area of the vehicle was sometimes modified by drug smugglers to enclose a hidden compartment.  Rule pulled up a little more to determine how many occupants were in the car.  The only person he could see was the driver -- a young female.

Rule noticed in the distance ahead another Highway Patrol vehicle stopped on the right shoulder with its emergency lights flashing.  The other KHP vehicle was being operated by Trooper Steve Harvey, who had stopped a semi-trailer and was conducting a commercial vehicle inspection.  Trooper Harvey's car was about a half-mile or a mile ahead when Rule first saw it.  Rule dropped back behind the Explorer to give it room to move over into the left-hand lane away from Trooper Harvey's car.  Rule dropped back six or eight car-lengths and gave the driver of the Explorer sufficient time and room to move over, but she remained in the right-hand lane adjacent to Harvey's vehicle as she passed by that vehicle.

Rule suspected at this point that the Explorer had a false compartment.  He also believed the driver had violated K.S.A. § 8-1530 by not moving to the left-hand lane as she passed Trooper Harvey's KHP vehicle.  He activated his emergency lights to stop the Explorer.  He took note that the vehicle's license tag number was AC48721.  Rule also noticed at about this point that the license number of the green Ford Escape behind the Explorer was a sequential number -- AC48722.  When the Explorer pulled over, Rule got out and approached the passenger side window to talk to the driver.  He spoke with the driver, defendant Archy Beltran-Lugo, and asked for her driver's license.  He explained that he made the stop

3

because she failed to move over when she passed by the other Highway Patrol vehicle.  Although she

spoke with a Spanish accent, Ms. Beltran understood sufficient English to communicate with the Trooper.

She produced her license, which had been issued in Mexico.  In response to a question from Rule, Ms.

Beltran said she was coming from Arizona and was going to Kansas City.  She indicated she had just

recently purchased the vehicle.  When Rule asked if she were traveling with any other vehicle, she

responded no.  Rule followed up by asking specifically if she was traveling with the other Arizona vehicle

that had been just behind her.  She again said no.  Rule was certain the two vehicles had been traveling

together.  As he testified at the suppression hearing, he believed the odds of two unrelated cars with

sequential Arizona specialty license plates being together in the same place on a Kansas highway like this

were "astronomical."  He was also aware from his experience that drug smugglers frequently travel in

tandem, with one car typically acting as a guide or scout for the other car.  He also knew from experience

that drug smugglers traveling in tandem -- unlike innocent tourists -- frequently deny that they are traveling

together when confronted by law enforcement.  Rule gathered Ms. Beltran's documents and headed back

toward his patrol car, stopping to look at the Explorer's rear wheel well.  He saw in the wheel well an

unusually heavy layer of undercoating and a metal panel that he was certain was not factory-installed.  Rule

testified this was the same type of metal panel he had seen on all of the other Ford Explorers he had

encountered with hidden compartments under the floor.  He testified that unlike the typical Explorer, the

wheel well area of this vehicle did not have a visible seam with bolts joining two sheets of metal just above

the gas line.  The metal panel above the gas line on this vehicle had a jagged or unfinished edge on it, unlike

the smooth contour of a factory-installed undercarriage.  This configuration was substantially similar to the

Explorers Rule had seen containing built-in false compartments.  Rule concluded there was probable cause

4

to believe the car had a hidden compartment containing drugs, and he placed Ms. Beltran under arrest. He then got on his radio and sent a request through the dispatcher for another Trooper to stop the Ford Escape that had been traveling behind the Explorer. A short time later, Trooper Harvey arrived, and Rule gave him a description of the other vehicle and its license number. Harvey was informed either by Trooper Rule or by the dispatcher that Rule had found a hidden compartment in the first vehicle and wanted to stop a second "scout" vehicle that had been traveling with the Explorer. Harvey proceeded down the highway after the second vehicle.

Trooper Rule retrieved his trained drug-detecting dog, "Igor," from the back of his vehicle. Rule testified he had not used the dog before this because he believed he already had probable cause for a search, but he decided to use the dog anyway at that point for practice. He worked the dog around the Explorer. Rule testified the dog eventually exhibited an "alert," or behavior change, which signified the dog had detected an odor of a controlled substance. Rule testified the dog was excited and jumped into the Explorer through the open passenger-side front window, although on cross-examination he conceded he could not remember exactly how the dog got in and that it was possible Rule had opened the door and let him in. Rule testified Igor went almost immediately to the back of the vehicle and "indicated" -- meaning he exhibited behavior signifying he had detected the source of the narcotic odor -- by scratching near the floor of the rear cargo area. Rule got in the Explorer and took a brief look where the dog had indicated, but he did not make a thorough search at that point because he knew it would be a significant undertaking to expose the hidden compartment and its contents.

Meanwhile, Trooper Harvey located the green Ford Escape on I-70 approximately eight miles east of the spot where Rule had stopped the Explorer. Based on the information provided by Rule, Harvey

5

turned on his emergency lights and stopped the Escape.  He approached the vehicle and started to speak with the driver, defendant Eden Zamudio-Carrillo, who produced a Mexico driver's license.  Mr. Zamudio initially started to speak in English but appeared to have difficulty and thereafter said something in Spanish. Trooper Harvey testified that Zamudio appeared to be very nervous and his hands were visibly shaking. Harvey had Zamudio step out of the vehicle, patted him down, and placed handcuffs on him.

Trooper Rule had the Ford Explorer towed to Troop D Headquarters in Hays.  A thorough search of the vehicle confirmed the presence of an added-on hidden compartment, approximately four inches in height, under the floor of the rear cargo area.  The compartment was opened, and packages containing about 23 kilograms of a cocaine mixture were found inside.  The Ford Escape was not searched initially due to the Troopers' past experience with "scout" vehicles.  According to their testimony, such vehicles usually do not contain drugs.  An inventory search was eventually conducted on the Escape, however, and a hidden compartment was found in that vehicle as well.  A search of the compartment disclosed the presence of about 9 kilograms of cocaine and 15 kilograms of heroin.

After Ms. Beltran was arrested and transported to Troop D Headquarters, KHP Trooper Alan Litton advised her of her rights under *Miranda v. Arizona*.  Ms. Beltran appeared to understand the Trooper's explanation.  She told him she wanted to waive her rights and speak to him.

At the suppression hearing on February 14, 2006, defendant Beltran presented testimony from Ronald Dehart, who is currently the body shop manager for Mel Hambleton Ford, a Ford dealership in the Wichita area.  Mr. Dehart testified he has repaired thousands of vehicles over the course of his career, including about 400-500 Ford Explorers.  Mr. Dehart testified concerning his examination of photographs of the wheel well of Ms. Beltran's Ford Explorer.  (He did not examine the actual vehicle).  He noted that

the pictures showed an excessive amount of undercoating in the area (he described the undercoating at one point as "enormous."). He also characterized as unusual the jagged panel wall that was previously testified to by Trooper Rule. Dehart testified the edge of this wall should have smooth, not jagged as it appeared in the picture. He said he had seen rough edges similar to this in the past on some low-quality repair jobs, and that he would probably assume the jagged edge was due to some sloppy repair work. He conceded that Government's Exhibit 3B [a photograph of the wheel well of defendant's Explorer] showed the area had been altered and looked "totally different" than it should, although he testified that he could not have detected a hidden compartment from the photos of the vehicle. Mr. Dehart conceded he had no experience in detecting false compartments.

The defendant also recalled Trooper Steven Harvey at the February 14th hearing to testify about the videotape from his KHP vehicle. The tape showed Harvey conducting a truck inspection shortly before the time the defendants and Trooper Rule passed by him on the highway. Harvey testified that he sometimes turns off his videotape recorder to save tape if a stop is near its conclusion and there is nothing unusual about the stop. He said he did so in this instance. The videotape [Defendant's Exhibit 1] shows that Trooper Harvey first stopped the truck in question at about 12:24 p.m. (according to the time stamp shown on the videotape) for a commercial vehicle inspection. He testified -- and the tape also shows -- that the stop was fairly routine. The ensuing 15 minutes or so of the stop was recorded, including Trooper Harvey's discussion with the truck driver while both of them were sitting in the KHP vehicle. At about 12:40 p.m. (again according to the time stamp on the tape), Harvey told the driver he was just printing out the inspection form and then they would be done. The videotape of the stop ends at that point because, as Harvey testified, he manually turned off the recorder. Immediately after this on the videotape, with the

time showing as 12:44 p.m., Trooper Harvey's car is shown as it pulls alongside Trooper Rule, who then

directs Harvey to pursue the Ford Escape.  During this latter incident, Trooper Harvey's video recorder

had been turned on again automatically by his use of the vehicle's emergency lights.  In the three or four

minute intervening time period in which the recorder was off, the defendants and Trooper Rule passed by

Harvey on the highway.

The court finds that Trooper Harvey's explanation as to why his videotape did not show the

defendants and Rule passing him is credible.  There is no evidence whatsoever that either of the troopers

manipulated, altered, or tampered with the video recording from Harvey's car.  The conclusion of

Harvey's truck inspection -- which occurred just before the defendants passed by -- is followed

immediately on the videotape by the footage of Harvey pulling alongside Trooper Rule -- which is sometime

after the defendants had passed by.  Absent some evidence that this footage was spliced together -- and

none has been presented -- this refutes any suggestion that Ms. Beltran's passing of Harvey on the highway

was first recorded on tape and then erased.  Moreover, any suggestion that Trooper Harvey purposely

turned off his video recorder at this juncture so as to avoid recording exculpatory evidence relating to a

*subsequent* stop by Trooper Rule is far-fetched to say the least.  In sum, there is not a shred of evidence

of any tampering with or manipulation of the video evidence.

II.  *Arguments*.

Defendant Beltran contends Trooper Rule did not have a reasonable suspicion of criminal activity

sufficient to justify a stop of her vehicle.  She argues she could not have moved her car to the left lane when

she was passing Trooper Harvey's car because Trooper Rule was in the left lane and it would have been

unsafe to move in that direction.  She also argues the mere fact of an alteration to her vehicle did not give

8

rise to a reasonable suspicion of criminal activity and did not give the officer grounds to stop the car. *Citing U.S. v. Orrego-Fernandez*, 78 F.3d 1497 (10th Cir. 1996).  Finally, even if the trooper had reasonable suspicion to justify a brief investigatory detention, Ms. Beltran argues he did not have probable cause to justify a search of the vehicle.  As such, she moves to suppress the evidence found in the vehicle.

Defendant Zamudio, for his part, argues there was no reasonable suspicion for a traffic stop of his vehicle (the Ford Escape), nor was there probable cause to justify his arrest.  He says the simple fact that Trooper Rule stopped Beltran's Ford Explorer because it had an apparently modified compartment does not justify the seizure and arrest of another driver, or the search of that second vehicle, merely because the Trooper believes the two persons may have been traveling together.  Defendant Zamudio moves to suppress any evidence obtained as a result of an unlawful search or seizure, including evidence of any statements he made to law enforcement officers.

III. *Discussion*.

A. *Defendant Beltran*.  The Fourth Amendment prohibits unreasonable searches and seizures by the Government.  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (en banc); *accord Whren v. United States*, 517 U.S. 806, 818 (1996).  Additionally, a brief investigatory stop of a person or vehicle by an officer is reasonable under the Fourth Amendment if the stop is supported by a reasonable suspicion of criminal activity.  *See United States v. Arvizu*, 534 U.S. 266, 274, (2002).

Based on the evidence presented, the court finds that Trooper Rule's initial stop of Ms. Beltran's

Ford Explorer was reasonable.  At the outset the court notes that insofar as the Fourth Amendment is

concerned, the reason *why* Trooper Rule first became suspicious of the Explorer and decided to follow

it is immaterial.  Thus, defendants' contention that Rule could not have seen what he claimed to have seen

initially would not, in itself, render his later stop invalid.  Nevertheless, the court finds Trooper Rule's

testimony credible that the Explorer was sitting somewhat differently than normal and that he noticed when

he first saw it there was something unusual about the underbody of the car in the rear wheel area.  The

court further credits his testimony that when he pulled alongside the Explorer on the highway, he was able

to confirm that there was a very heavy layer of undercoating and what appeared to be a jagged panel wall

running over the gas line and toward the back of the vehicle.  Rule knew from his experience that this

indicated the vehicle may have been modified to contain an enclosed compartment for carrying contraband.

He was also aware that this particular vehicle was apparently from the southwestern United States and was

traveling to the east in tandem with another vehicle.  Both of these were factors that Rule knew to be fairly

common for individuals smuggling drugs on I-70.  Based on his observations, and interpreting them in light

of his extensive experience with drug couriers, the court concludes that Rule had a reasonable suspicion

prior to the stop that the vehicle was being used for drug smuggling.  The initial stop of the Explorer was

therefore reasonable.  *Arvizu, supra*.  Moreover, when the driver of the Explorer passed by Trooper

Harvey's car on the highway with its emergency lights flashing and she failed to move to the non-adjacent

lane despite having room to do so, Trooper Rule had probable cause to believe the driver violated K.S.A.

§ 8-1530.[2]  There is no credible evidence that the conditions were such that Ms. Beltran could not have

---

    [2] Section 8-1530(b)(1) provides in substance that when a driver approaches a stationary
emergency vehicle with its emergency lights flashing on a highway carrying two or more lanes of traffic in

safely moved her vehicle to the left lane as she passed by Trooper Harvey. Thus, the initial stop was reasonable.

When Trooper Rule stopped Ms. Beltran, she told him she was traveling from Arizona to Kansas City. When he asked if she was traveling with the other Arizona vehicle that had been behind her, she said no. The facts available to the Trooper indicated clearly that the two vehicles were together. The presence of two sequentially-numbered Arizona specialty license plates suggested not only that the two vehicles were together but that they were somehow closely connected to one another. The evidence shows that Ms. Beltran's answer was not a product of miscommunication or misunderstanding. Rule thus had an objectively reasonable basis for believing that Ms. Beltran was lying to him about being with the other vehicle. And he knew from his experience that drug smugglers often use two vehicles traveling together but the drivers will typically deny any connection with each other when confronted by law enforcement. After speaking with Ms. Beltran, Rule was able to stop by the rear wheel well and visually inspect the underside of the Explorer. He could see that a non-factory panel wall with a jagged edge had been installed in an area above and around the gas line of the vehicle. The panel wall that he saw was essentially identical to every prior instance he had seen of a hidden compartment being added to a Ford Explorer. Rule's observations suggested there was likely a four or five inch area behind the panel wall that was closed in by the modification. Rule also saw an unusually heavy area of fresh undercoating, which he reasonably interpreted as an attempt to disguise or cover up the modification to the panel wall underneath.

_____

the same direction, the driver shall proceed with caution and, if conditions make it possible, "shall change lanes into a lane that is not adjacent to that of the stationary authorized emergency vehicle...."

Subsection (c) of the same section directs that a law enforcement officer shall issue a warning citation to anyone violating the provisions of subsection (b).

Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence of a crime. *United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993). It is well-established that evidence of a hidden compartment can contribute to probable cause to search. *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004). "Whether probable cause to search a vehicle can be based on evidence of a hidden compartment depends on two factors: (1) the probative value of the evidence-that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband." *Id.* The court concludes that the facts observed by Trooper Rule, when considered in light of the reasonable inferences he was able to draw from his training and experience, established a reasonable probability that a hidden compartment was present in the Explorer. Trooper Rule could see that the panel wall in this area of the Explorer had been rather crudely modified from a standard factory-issue Explorer. (The difference between the two is demonstrated by comparing Government's Exhibits 3A and 5A.). He knew from experience that drug smugglers often use this very area of the Explorer to enclose a four or five inch area under the floor of the vehicle. He also saw that undercoating had been applied to the area as part of an apparent effort to cover up the modification. The modification was essentially identical to every other false compartment he had previously detected in Ford Explorers. In addition, he was aware that this vehicle was traveling from the southwest United States to the east across I-70, that it was traveling together with another vehicle, and that the driver of the Explorer lied to him when he asked about being together with the other vehicle. Based on the totality of the circumstances, there was a fair probability that the vehicle contained a hidden compartment. And, notwithstanding defense counsel's creative attempts to suggest possible lawful uses for such a compartment

12

of this type, it is highly likely that a vehicle with such a compartment under these circumstances would be secreting contraband.  *Cf. United States v. Jurado-Vallejo*, 380 F.3d 1239, 1242 (10th Cir. 2004).

In reaching this conclusion, the court has considered the defense's evidence from Mr. Dehart, a body shop expert.  His testimony does not alter the above conclusions for several reasons.  First, Mr. Dehart did not make a visual inspection of the Explorer, but testified solely on the basis of photographs. The photographs, however, offer a very limited view of what an individual actually looking at the vehicle would be able to see.  Second, his testimony actually emphasized the makeshift nature of the modification observed by Trooper Rule.  Mr. Dehart noted the excessive undercoating in the area, and he described how the jagged edge of the metal above the gas line was clearly different from a normal Explorer.  Mr. Dehart said he would assume that this was merely due to a very poor repair job, but as he conceded he has no experience whatsoever in detecting hidden compartments, and he thus could not really make an assessment of the likelihood that this vehicle contained such a compartment.  Nor could Mr. Dehart be expected to assess the significance of other facts known to the Trooper at the time of the incident, such as the fact that the driver lied about traveling with another vehicle.  Under the totality of the circumstances, the probability that this was simply an innocuous but poorly performed repair job was far less likely than the probability the vehicle had been modified to contain a hidden compartment for carrying contraband.  In sum, the court concludes that the officer had probable cause to believe the car contained contraband and that the driver was committing a criminal offense. As such, the arrest of Ms. Beltran and the subsequent search of the Explorer were reasonable under the Fourth Amendment.[3]  *See United States v. Oliver*, 363

---

[3] In view of the court's findings above, the fact that Trooper Rule's dog subsequently indicated the presence of controlled substances in the vehicle is immaterial.

F.3d 1061, 1068 (10th Cir. 2004) ("Under the automobile exception, police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.").

      B.  *Defendant Zamudio*.

      The court also concludes that the arrest of Mr. Zamudio and the search of his vehicle were likewise reasonable under the Fourth Amendment.  Probable cause to arrest exists when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.  *See United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).  The probable-cause standard is a "practical, nontechnical conception" that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).  It is a "fluid concept" that turns on an assessment of probabilities in particular factual contexts, "not readily, or even usefully, reduced to a neat set of legal rules." *Id*. at 370-71.  The substance of all of the various formulations of probable cause is "a reasonable ground for belief of guilt," and the belief must be particularized with respect to the person to be searched or seized. *Id*. at 371.

      As noted above, Trooper Rule had probable cause to believe Ms. Beltran's vehicle contained a hidden compartment with contraband.  He was also aware of facts showing that Ms. Beltran was traveling together with the driver of the Ford Escape.  Although these facts by themselves might not establish probable cause to arrest the driver of the Escape, the evidence shows that the officers were aware of additional facts, prior to the arrest, that would warrant a reasonable belief that the driver of the Escape was

aiding and abetting in a criminal offense.[4]  Taken as a whole, these facts go beyond merely being in close proximity to or associating with someone suspected of a crime.  *Cf. United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998).  First of all, Trooper Rule was aware from prior experience that drug couriers frequently travel the highway in tandem so that one vehicle can assist the other in avoiding law enforcement or other problems.  Second, when Ms. Beltran was asked about the Ford Escape, she lied to Trooper Rule and said she was not traveling with that vehicle.  Third, the sequentially-numbered Arizona specialty license plates on these two vehicles indicate not only that the two vehicles were together, but further suggest some sort of intimate connection between the two vehicles and/or their drivers.  *Cf. United States v. Valenzuela*, 365 F.3d 892, 898 (10th Cir. 2004) (court's finding of no probable cause was based in part on absence of evidence that two vehicles were driving in tandem).  Additionally, the presence of a modified compartment under the Explorer would tend to suggest that more than one person was likely involved in the drug offense.  Also, the court notes that Ms. Beltran indicated to Trooper Rule she had just recently acquired her vehicle, a circumstance which makes it more likely that the driver of the Escape -- with a sequentially numbered tag -- also just acquired that vehicle, and that the vehicles were obtained for purposes related to Ms. Beltran's transportation of drugs.  Under the totality of the circumstances, the facts known to the officers in addition to the apparent presence of a false compartment in the Explorer would have suggested to a reasonable person that the drivers of these two vehicles were engaged in a joint enterprise involving drug smuggling.  As such, the court concludes that the detention and arrest of Mr.

---

[4] Inasmuch as the existence of probable cause can rest upon the collective knowledge of the police involved in an investigation rather than solely upon the officer who made the arrest, it is immaterial whether the facts discussed above were specifically known by Trooper Harvey at the time he arrested Mr. Zamudio.  *See United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003).

Zamudio was supported by probable cause and was reasonable under the Fourth Amendment.

The court notes that defendant Zamudio's challenge to the search of his vehicle appears to depend solely on his argument that his detention and arrest were not supported by probable cause and were illegal.[5] Inasmuch as the court has rejected that argument, the court concludes that his challenge to the search of the vehicle should also be denied. The officers' seizure and arrest of Mr. Zamudio, as well as the seizure and search of his vehicle, were all reasonable under the Fourth Amendment.

IV. *Conclusion*.

Defendant Beltran's Motion to Reopen the Record (Doc. 29) and Motion for Discovery (Doc. 30) are GRANTED. The motions to suppress of defendants Beltran and Zamudio (Docs. 16 and 22) are hereby DENIED.

IT IS SO ORDERED this __1st__ Day of March, 2006, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge

---

[5] Counsel for Mr. Zamudio made this point at the suppression hearing when he objected to the Government's attempt to introduce evidence relating to an inventory search of the Ford Escape. Based upon counsel's representation, the court sustained defendant's objection to the relevance of such evidence.